[No. F049481. Fifth Dist. Apr. 13, 2007.]

WOODWARD PARK HOMEOWNERS ASSOCIATION, INC., et al., Plaintiffs and Appellants, v.
CITY OF FRESNO et al., Defendants and Respondents;
DeWAYNE ZINKIN, Real Party in Interest and Respondent.

688

COUNSEL

Law Offices of Richard L. Harriman and Richard L. Harriman for Plaintiffs and Appellants.

James C. Sanchez, City Attorney, David P. Hale, Assistant City Attorney, Kathryn Phelan, Deputy City Attorney; Burke, Williams & Sorensen, Geralyn L. Skapik, Amy E. Morgan and Stefanie G. Field for Defendants and Respondents.

Motschiedler, Michaelides & Wishon, James A. McKelvey and C. William Brewer for Real Party in Interest and Respondent.

OPINION

**WISEMAN, Acting P. J.**—This case concerns the City of Fresno's approval of a new commercial development on vacant land near Woodward Park in Fresno. Invoking the California Environmental Quality Act (CEQA) two local organizations asked the superior court to set aside the city's approval. The court declined. We will reverse the superior court's decision. As we will explain, the city's actions violated CEQA and it must do the environmental review process over if it wants to approve the project.

One of CEQA's two major purposes is to require public agencies to adopt feasible mitigation measures to lessen the environmental impacts of the projects they approve. In this case, the project was expected to impact an already congested freeway interchange at State Route 41 and Friant Road. The city calculated a freeway impact fee of the kind frequently imposed on developments in other cities, but throughout almost the entire CEQA review process, the city took the position that it need not impose the fee or any other freeway mitigation measure. It took this position based on a long-standing Fresno policy of approving projects despite unmitigated freeway impacts, a policy apparently arising from the city's dissatisfaction with information provided to it by Caltrans. The policy is illegal because CEQA does not allow agencies to approve projects after refusing to require feasible mitigation measures for significant impacts. If the project went ahead without any freeway traffic mitigation, the driving public would be left "holding the financial bag."

At the last minute, during the city council meeting at which the project was approved, the city decided to accept Zinkin's offer to pay a small freeway

impact fee. The fee was legally inadequate; as we will explain, the amount was not supported by sufficient evidence.

CEQA's other major purpose is to inform the public and decision makers of the consequences of environmental decisions before those decisions are made. In this case, the city's review process failed to inform the public because the two environmental documents the city produced—an environmental impact report and a statement of overriding considerations—were deeply flawed. An environmental impact report, as its name suggests, is meant to report the environmental impacts a project will have. In this case, the environmental impact report usually measured the project's impacts by comparing it to a massive hypothetical office park, instead of comparing it to the vacant land that actually exists at the project site. This hypothetical office park was a legally incorrect baseline, which resulted in a misleading report of the project's impacts.

A statement of overriding considerations gives a public agency's reasons for approving a project—its overriding considerations—even though the project will have significant environmental impacts that cannot be substantially lessened by mitigation measures. In this case, the statement of overriding considerations engaged in a serious misrepresentation. It claimed that the proposed project would have economic benefits superior to those of the three alternatives considered in the environmental impact report because those alternatives "generally propose no development or development to a lesser degree." In reality, the three alternatives in the report were *as large as or larger than the proposed project*, and the record contained no reason to think their economic benefits would be smaller. The real difference was that the proposed project included a shopping center—which was a primary target of many members of the public opposed to the project—while the alternatives had no shopping center or a smaller shopping center, but more office space. The statement of overriding considerations camouflaged this difference by substituting the unsupported claim about economic superiority.

The city's environmental review process failed to satisfy either of CEQA's two main purposes. We will not speculate about why this happened, but a dissenting member of the city council observed at the meeting in which the project was approved that "we're talking about issues that . . . a couple of years ago we wouldn't have even discussed like EIR's . . . and a developer putting [freeway traffic impact mitigation fee] money into . . . Caltrans." If, as this comment suggests, the city's culture of CEQA compliance is only now emerging, it would be a disservice to the public if a project of this magnitude were to go forward based upon a foundation that is so flawed.

## *FACTUAL AND PROCEDURAL HISTORIES*

Real party in interest DeWayne Zinkin, doing business as Zinkin Development Company, LLC (Zinkin), obtained the approval of respondent City of Fresno (the city) to build a development on a 38.93-acre parcel located immediately to the east of the intersection of North Friant Road and North Fresno Street, one long block from the interchange between Friant Road and State Route 41. The approved project consisted of 274,000 square feet of office space and a 203,000-square-foot retail shopping center. Zinkin's proposal also tentatively included 20 apartments, but the approval was not conditioned on the inclusion of any apartments in the final plan. The actual number of apartments was to be determined later, when the developer would submit a site plan and apply for a conditional use permit. As the city explains in its brief, "[t]he 20 units mentioned in the application [are] just a 'place holder,' included as part of the conceptual plan."

The city's approval of the project was comprised of several distinct acts. First, the city certified an environmental impact report (EIR) and a statement of overriding considerations pursuant to CEQA (Pub. Resources Code, § 21000 et seq.).[1] Then a portion of the property previously zoned for office and residential uses was rezoned to permit construction of a shopping center. Finally, the city amended the Fresno General Plan and the Woodward Park Community Plan to permit construction of a shopping center on a portion of the property. The plans previously designated this portion for office development. The approval was subject to a number of conditions in addition to the mitigation measures set forth in the EIR, including approval of a master conditional use permit and a site plan; exclusion of a supermarket (but allowance of a large specialty grocery store); and construction of improvements to the streets bordering the property.

Like all EIR's, the EIR in this case evaluated the environmental impacts of the proposed project by comparing the project's environmental effects with the preexisting environmental baseline at the site without the project. According to the Guidelines for the Implementation of the California Environmental Quality Act (Cal. Code Regs., tit. 14, § 15000 et seq.; hereafter Guidelines), the environmental baseline on the basis of which the environmental impacts of the project are to be measured normally is the physical condition of the project site at the time the notice of preparation of the EIR is published. (Guidelines, § 15125, subd. (a).) In this case, the project site was (and still is) a vacant lot.

---

[1] Subsequent statutory references are to the Public Resources Code unless indicated otherwise.

The EIR does not contain an explicit statement of the baseline it used. In setting forth the project's impacts on air pollution and traffic congestion (the main points at issue in the subsequent litigation), however, the EIR compared the project's impacts with those of a large-scale (more than 600,000 square feet) office and office-related retail development that could be built consistently with the existing zoning and plan designations. The traffic congestion study also examined area traffic without any development on the site (i.e., the traffic presently existing), but the air pollution study compared the proposed project's emissions only with the emissions that would be associated with an office development allowed under existing zoning, not a vacant lot.

In its air pollution discussion, the EIR noted that Fresno County is a nonattainment area (i.e., an area in which regulatory thresholds are exceeded) for ozone and 10-micron particulate matter (referred to as $PM_{10}$), and that any net increase in these pollutants is considered significant. The EIR compared, on the one hand, emissions of $PM_{10}$ and ozone precursors (referred to as ROG and $NO_x$) associated with operating the office project allowable under existing zoning, with, on the other hand, emissions of the same pollutants that would be associated with operating the proposed project. It found that the proposed project "generates slightly more emissions" than the chosen baseline. The EIR then stated (1) that because the project is in a nonattainment area, certain mitigation measures should be incorporated into the project; (2) that a significant, unavoidable impact to $NO_x$ emissions would remain in spite of these measures; and (3) that emissions associated with operating the project would otherwise be insignificant with mitigation. The EIR also called for mitigation measures to limit the emissions of $PM_{10}$ associated with dust caused by the actual construction of the project, measures it said would render the construction impact insignificant.

The EIR's traffic discussion included comments on both surface streets and the nearby freeway, State Route 41, and its on- and off-ramps on Friant Road. The discussion of surface streets includes tables comparing, on a scale of A to F (F being the worst), existing traffic and existing traffic plus project-generated traffic at several intersections and road segments surrounding and adjoining the project site. It concluded that the project would cause one street segment and two intersections to fall from acceptable levels of service, defined as D or better, to E or F.

The discussion of surface streets also compared traffic at the surrounding street segments and intersections with and without the project in 2025. It concluded that, with or without the project, three street segments will operate at level C or D in 2025, while the remaining eight segments will operate at level F. Also, with or without the project, all nine intersections studied will operate at unacceptable levels in 2025.

As mitigation measures for surface streets, the EIR called for the construction of a new lane on the project's side of Friant Road, widening of the approaches to several intersections, synchronizing of existing traffic signals, and installation of two new traffic signals. Significant, unavoidable impacts to surface street traffic would remain after mitigation. This is because achieving nonfailing levels of service would require the addition of lanes to several of the surrounding streets, for which "[r]ight-of-way costs would be too significant . . . ."

The EIR's discussion of freeway traffic was brief but generated substantial controversy. The final circulated draft of the EIR included an impact mitigation fee figure in a table titled "SR 41 Project-Related Trip Impact and Fair Share Estimate." This table shows projected peak-hour trips generated by the project at several points in the interchange between State Route 41 and Friant Road. It stated that the trip-generation figures were estimated using the Council of Fresno County Governments' regional traffic model. For each point in the interchange, the table showed a cost per trip. These figures were supplied by Caltrans. The table then multiplied the cost per trip by the number of trips for each point in the interchange and totaled the results. It showed a total fair share estimate of $31,155.

Having calculated the $31,155 figure, the EIR then declined to require the developer to pay it, stating: "It is noted that Caltrans did not provide a source document or 'nexus study' for the cost per trip by improvement or segment along SR 41 identified in [the table]. In the absence of such documentation by Caltrans, such fees have not been required as mitigation or conditions of approval by the City of Fresno."

The EIR went on to state that, because the proposed project would generate fewer total peak-hour trips than a project allowable under existing zoning, "the assessment of fees to address project-related impacts along SR 41 may not be appropriate," even apart from the issue of Caltrans's failure to deliver the desired information. The city "does not object," however, to the developer paying the fee "voluntarily."

After the EIR was circulated in draft form, Caltrans submitted a comment letter responding to these remarks. It stated that the city had all the information it needed and that, in any event, as the lead agency, the city had a legal duty to require mitigation of all the significant impacts it identified. It also argued that, because no freeway traffic impact mitigation was required when the existing zoning was put in place in 1990, a comparison between impacts from a project that could be built under that zoning and the proposed project was irrelevant.

Caltrans also disputed the amount of the fee. It stated that, among other, smaller deficiencies, the EIR failed to reflect 157 project-generated evening peak-hour trips traveling on a proposed southbound auxiliary lane between the Friant and Herndon exits. With these, the fee amount would be $445,817. The letter further stated that in 1998, Zinkin agreed to pay a voluntary impact mitigation fee of $37,500 for another project, but never paid it.

In its responses to public comments in the final EIR, the city made some adjustments, increasing its fee calculation to $43,897. It disputed the bulk of the difference between its and Caltrans's figures, saying that, although the project would generate 157 trips in the southbound auxiliary lane between Friant and Herndon, project traffic would use only *part* of that lane. Caltrans did not supply a figure or methodology for determining this partial use, so the city set the fee for it at *zero*. The city still was not requiring the developer to pay any amount and recited a variety of reasons for its policy of allowing impacts of this kind to stand unmitigated. Regarding the voluntary $37,500 fee in the 1998 case, the city stated that Zinkin never paid this amount because Caltrans "verbally rejected" it.

Caltrans replied, accepting the assertion that project traffic would not use all of the auxiliary lane. It reduced its fee calculation to $306,558. It also responded to the city's request that it explain its methodology by supplying the worksheets it used in making its calculations. Arguing against the city's stated policy of refusing to demand that developers pay freeway traffic mitigation fees, Caltrans observed that "it is common practice throughout the State of California for a Lead Agency to require mitigation for State Highways as a condition of project approval . . . ." It denied that it ever rejected the $37,500 for the earlier project and stated that it has requested this payment multiple times without response by the city or applicant.[2]

At the meeting in which the city council approved the project, Zinkin's attorney proposed to have the city impose a fee of $45,000 "in a spirit of compromise" in light of the fact that "expert opinion as reflected in the EIR" ranges from "$0 – $306,000." The attorney claimed that "there is no legitimate basis for imposing that," but "we volunteered to have that imposed." Later in the meeting, a council member moved to approve the project, mentioning the $45,000 payment in his motion. The city attorney

---

[2] After this court originally issued its opinion in this case, the city and Zinkin requested that we take judicial notice of an agreement between Caltrans and Zinkin executed May 30, 2006, relating to the earlier project. The request is granted. This agreement describes Zinkin's 1998 offer and states that Caltrans accepted it in 2000, contradicting the city's assertion during the CEQA review process in this case that Caltrans had rejected the offer. The agreement states that Zinkin and Caltrans then "negotiated" a payment of $27,000. In his request for judicial notice and accompanying papers, Zinkin does not deny that the original offer and acceptance were for $37,500 and does not claim that the agreement for that amount was ever honored.

asked the council for "clarification" of whether "[t]he $45,000 voluntary mitigation fee" would be added to the resolution certifying the final EIR. She never received clarification during the meeting. A version of the proposal (for $43,897) did, however, appear in the council's resolution certifying the EIR. We will set forth the details of the adopted version later in this opinion.[3]

The EIR discussed another set of impacts under the heading "Land Use and Planning." This discussion concerned the inconsistency of the project with the city's general plan and the Woodward Park Community Plan. The EIR explained that the plans designated the site for office development, not for offices and a shopping center, but that the proposed plan amendment would change this designation and eliminate the discrepancy. The EIR also stated that the Woodward Park Community Plan includes a policy limiting the amount of retail development in the Woodward Park neighborhood according to a formula tied to population growth. The shopping center component of the project would exceed these limits. The EIR asserted, however, that the city's general plan had an overriding provision that included the project site in a classification called the Woodward Park Activity Center, which was exempt from the Community Plan's retail development limitations. The EIR characterized the project's inconsistency with the Community Plan as a potentially significant impact, but concluded that no mitigation was required because of inclusion of the project site in the activity center. Additional impacts on land use and planning, including exceeding an existing single-story limitation on part of the property and impairing trail access, were found to be insignificant with mitigation measures.

The project's other impacts were discussed under the headings of geology and soils, biotic resources, noise, drainage, public facilities and services, aesthetics, and cultural resources. None of these are at issue in this appeal.

---

[3] After this court originally issued its opinion in this case, the city and Zinkin filed a request for rehearing or modification, supplying for the first time a citation to the administrative record supporting their claim that the city council's resolution certifying the EIR included a freeway-related measure. The city and Zinkin claimed in their original briefing that the city's approval included this measure, but their record citations did not bear out the claim. They claimed this again in their supplemental briefing after this court's briefing letter stated that there appeared to be no freeway traffic impact mitigation measure (and after the court granted an extension of time to a date stipulated to by all parties), but again their record citations failed to substantiate the claim. The court specifically asked them for a citation at oral argument, but again they failed to supply one that bore out the claim and failed to request leave to file a letter brief supplying one. Finally, after employing new appellate counsel, they produced the correct citation (pages 2022 and 2567 of the administrative record) in their request for rehearing or modification. They also asserted that, previously, the court did not give them a sufficient opportunity to address this issue. The procedural history just recited refutes this assertion. Needless to say, it is counsel's responsibility to supply correct record citations in support of all factual assertions. The opportunities for doing so were more than adequate. We have, however, modified the opinion in the interest of accuracy to reflect the facts belatedly brought to our attention.

About each of them, the EIR either found the project's impacts insignificant or required mitigation measures that would render them insignificant. There were two exceptions. First, the site would look different after development and, even with mitigation measures, this would be a significant, unavoidable aesthetic impact. Second, the project would create light and glare. The EIR described this as a potentially significant impact but required no mitigation.

Like all EIR's, the EIR in this case discussed possible alternatives to the project. CEQA requires discussion of project alternatives in order to provide decision makers and the public with a reasonable picture of the range of feasible choices with lesser environmental impacts. (Guidelines, § 15126.6, subds. (a)–(d).) Every EIR must include a "no project alternative" in order to "allow decisionmakers to compare the impacts of approving the proposed project with the impacts of not approving the proposed project." (Guidelines, § 15126.6, subd. (e)(1).) The no-project alternative must discuss "existing conditions" without the project but must also examine "what would be reasonably expected to occur in the foreseeable future if the project were not approved . . . ." (Guidelines, § 15126.6, subd. (e)(2).)

In this case, the EIR discussed three alternatives to the proposed project. Under the heading "No Project Alternative," the last draft EIR stated that "[t]he site would remain vacant but could be developed with offices as allowed by current planning and zoning designations." This suggested that the no-project alternative might have been either a vacant lot or the maximum office construction allowable under existing zoning. Apparently in response to public comments, the final EIR removed this ambiguity, saying "[t]he No Project alternative is considered office development according to existing zoning." It was already clear, however, from the final draft EIR's analysis that no comparison of the project with a vacant lot was ever intended. It says the no-project alternative "has the potential to slightly reduce" "impacts to resources including traffic, air quality, and noise" relative to the proposed project. The no-project alternative might "generate about 1/2 the daily trips" and thus would "reduce impacts from traffic," while air pollution impacts would be "reduced slightly"; "[i]mpacts to geology and soils would be similar in that 100% site development would occur," and other impacts would also be similar. In all this, it is obvious that the no-project discussion compares the proposed project's impacts only with those of maximum office construction under existing zoning, not with the existing physical situation.

Although the EIR's section on alternatives did not say how large the maximum project allowable under existing zoning would be, other parts of the EIR did. Under existing zoning, an office park of 694,000 square feet could be built, consisting of 548,000 square feet of office space and 146,000 square feet of office-related retail space. The proposed project is 477,000

square feet, consisting of 274,000 square feet of office space, 203,000 square feet of community commercial (i.e., shopping center) space, plus 20 (or more or fewer) apartments, as we have said.

The second alternative was called "Planned Office Development." This was an office development of 652,000 square feet, consisting of 489,000 square feet of office space and 163,000 square feet of office-related retail space, plus 135 apartments. Overall trip generation would be less than with the proposed project by about 3,000 trips per day, but peak-hour traffic would be greater. Air pollution impacts would be less because of the smaller traffic impacts. Demands on public services would be greater because of the larger number of apartments. Other impacts would be about the same.

The third alterative was called "Reduced Intensity Alternative." The EIR's original description of this alternative obscured its actual scope. It stated that "[f]or the southern half of the property, it is estimated that commercial [i.e., shopping center] uses would occupy 88,000 square feet, and office uses 140,000 square feet." The description said "[t]he balance of the project site would be developed with increased office uses," but did not say what quantity of development that would involve. In the final EIR's responses to comment letters, it was made clear that the Reduced Intensity Alternative has a total of 414,000 square feet of office space. The total square footage of this alternative is thus 502,000.

The EIR concluded that the Reduced Intensity Alternative would generate 2,100 fewer trips than the proposed project. It also stated, however, that peak-hour traffic could be greater. Air pollution impacts would be less because of the smaller traffic impacts. Other impacts would be similar to those of the proposed project.

After describing the three alternatives and comparing them with the proposed project, the EIR compared the alternatives with one another. Although the three alternatives were similar to each other in that they all would cause somewhat less air pollution, somewhat less traffic congestion except at peak hours, and minimal differences with respect to other impacts when compared with the proposed project, the EIR found that the Planned Office Development was "the environmentally superior alternative for the project site." That alternative was, however, "not feasible from the applicant's standpoint" because it lacked a shopping center. Office-related retail space was included, but under the limitations of that type of retail, "it would be virtually impossible to develop the planned office development alternative with the maximum allocation of 25% of the site in commercial uses." The Reduced Intensity Alternative did include a shopping center, but this alternative was also "not feasible from the developer's standpoint" because it would

not include a supermarket. "Without the supermarket, leasing becomes difficult, and revenues to the developer are generally not sufficient to support enhanced architecture and other quality commercial features." Further, shopping centers in Fresno without supermarkets "are usually smaller strip centers that struggle with vacancies and have aesthetic, landscaping, and signage issues." The proposed project did originally include a supermarket, but the city refused to approve that component and prohibited a supermarket in the resolutions approving the project. City staff concluded that the supermarket would generate too much peak-hour traffic. This did not cause the developer to abandon the project as infeasible.

The proposed project and the three alternatives set forth in the EIR are summarized in the following table:

| | PROPOSED PROJECT | NO-PROJECT ALTERNATIVE | PLANNED OFFICE DEVELOPMENT ALTERNATIVE | "REDUCED INTENSITY" ALTERNATIVE |
|---|---|---|---|---|
| *Office space* | 274,000 sq. ft. | 548,000 sq. ft. | 489,000 sq. ft. | 414,000 sq. ft. |
| *Shopping center* | 203,000 sq. ft. | | | 88,000 sq. ft. |
| *Office-related retail* | | 146,000 sq. ft. | 163,000 sq. ft. | |
| *Apartments* | 20 ("place holder" figure) | | 135 | |
| *Total project size* | **477,000 sq. ft. + (perhaps) 20 apartments** | **694,000 sq. ft.** | **652,000 sq. ft. + 135 apartments** | 502,000 sq. ft. |

Due to the fact that the city decided to approve the project even though the EIR found significant, unavoidable air and traffic impacts that would not be mitigated to an insignificant level, a statement of overriding considerations was required. (§ 21081, subd. (b).) This is a statement in writing, supported by substantial evidence in the record, of "specific economic, legal, social, technological, or other benefits" of the proposed project that "outweigh the unavoidable adverse environmental effects . . . ." (Guidelines, § 15093, subd. (a).) Notes in the Guidelines describe this as a "balancing statement" setting forth the agency's "views on the ultimate balancing of the merits of approving the project despite the environmental damage." (Guidelines, discussion foll. § 15093.)

The statement of overriding considerations found that the project was justified despite the significant, unavoidable impacts because "[t]he other alternatives would offer a lesser variety of employment opportunities, less

available services for the community and less available housing." It uses other formulations to make the same points: "The benefits of providing a mixed use development with a diverse variety of office uses together with commercial goods and services and residential uses within a given neighborhood would be reduced with any of the proposed alternatives"; "[t]he proposed mixed use project is superior to the alternatives which would propose less intense projects with a lesser range of employment opportunities within close proximity to the surrounding residential community." These asserted advantages of the proposed project may be summarized as follows: (i) it will generate more economic activity, including creation of a variety of jobs, than the alternatives, and (ii) it will serve the goal of providing mixed uses better than the alternatives. The statement of overriding considerations found that "the benefits identified . . . are each one, in and of themselves, sufficient to make a determination that the adverse environmental effects are acceptable."

The claimed benefits of the proposed project are based in large measure on the assertions that the alternatives considered in the EIR "generally propose no development or development to a lesser degree" and that under the no-project alternative, "the project site would remain vacant." In other words, at least with respect to the amount (as opposed to the variety or mixture) of economic activity the project would promote, the statement's finding is that the proposed project has greater benefits than the alternatives because it is larger or more intensive.

The assertion that the proposed project was larger or more intensive than the alternatives was not consistent with the EIR's description of those alternatives. As we have just seen, the alternatives considered in the EIR did not "generally propose no development or development to a lesser degree" and the no-project alternative described in the EIR was not one in which "the project site would remain vacant." The no-project alternative was more than 200,000 square feet larger than the office and commercial part of the proposed project. Unless the 20 apartments would comprise a whopping 10,000 square feet each—four to five times the size of a typical detached house—the no-project alternative was actually a more intensive development than the proposed project. The record contains no information about the proposed size of the apartments, which are, as the city says, only a place holder; the actual number could be zero.

The Planned Office Development was also a larger development. It contemplated 175,000 more square feet of commercial and office development and 115 more apartments than the proposed project. The so-called Reduced Intensity Alternative was about as large as the proposed project. It included

no apartments, but its office and shopping center combined were larger than the commercial portions of the proposed project by 25,000 square feet (502,000 versus 477,000).

The real difference between the proposed project and the alternatives described in the EIR was that the alternatives had office-related retail instead of a shopping center or had a smaller shopping center. The statement of overriding considerations contained no discussion of why a large office development with office-related retail space should deliver a smaller quantity of economic benefits than a smaller office development with a shopping center.

Members of the public commented extensively on the EIR before it was certified. Numerous comment letters and extensive public comments at the city council meeting and the planning commission meeting are included in the administrative record. The comments were detailed and covered a wide variety of topics, including air pollution; traffic congestion (together with freeway traffic impact mitigation fees); the appropriate mix of land uses; whether a vacant lot or the maximum project buildable under existing zoning was the appropriate basis of comparison for determining the project's environmental impacts; and whether the EIR's consideration of project alternatives was sufficient. It does not appear that the statement of overriding considerations was made available to the public before the city council meeting at which approval was granted (the document's header reads "City Council Hearing December 7, 2004," the date of the meeting, and no version of it was attached to earlier drafts of the EIR in the record), but Woodward Park's counsel mentioned it orally at the meeting and it was a subject of critical discussion by one of the council's members during the meeting. A city staff report presented to the planning commission and city council also raised a wide variety of issues.

After the city approved the project, appellants Woodward Park Homeowners Association, Inc., and Valley Advocates (collectively, Woodward Park) filed a petition for a writ of mandate in superior court, asking the court to reverse the city's action. The petition named the city and city council as defendants and Zinkin as a real party in interest. It also named Caltrans and the San Joaquin Valley Air Pollution Control District as real parties in interest, stating that they were responsible agencies.

The petition alleged five causes of action. The first was "Failure to Require Feasible Mitigation for Significant Cumulative Traffic Impacts" in violation of CEQA. This cause of action referred to the city's refusal to impose the impact mitigation fee proposed by Caltrans for the project's burden on the interchange between State Route 41 and Friant Road. It alleged that the city

has "persistently and obdurately . . . refused to comply with the mandate of CEQA that significant adverse effects of . . . projects shall be . . . mitigated where . . . feasible."

The second cause of action alleged "Inadequate Analysis of Cumulative Impacts to Air Quality" in violation of CEQA. It stated that the city "failed to require a quantitative analysis of what beneficial impacts the mitigation measures requested by Caltrans would have caused in the vicinity," and "failed to provide a quantitative study or analysis of the potentially significant adverse impacts to public health in the" area.

The third cause of action alleged another CEQA violation and was headed "Inadequate Analysis of Project Alternatives; Failure to Require the Environmentally Superior Alternative." It asserted that the city failed to "make a good faith effort" in its consideration of alternatives and should have considered and approved "a true 'mixed use' land plan with substantially more residential dwelling units . . . ."

The fourth cause of action alleged that, by approving the project and amending the city's general plan, the city rendered the general plan internally inconsistent and inconsistent with the Woodward Park Community Plan and thereby violated Government Code section 65300.5. It asserted that the plans contemplated 20 to 50 percent housing in new development projects in the area and that the proposed project did not include nearly that amount.

The fifth cause of action, "Improper Procedure Used to Adopt Statement of Overriding Considerations," alleged an additional CEQA violation. It asserted that the statement of overriding considerations was "not supported by substantial credible evidence in the record"; "failed to utilize the proper 'weighing and balancing' procedure . . . in that there is no quantification of economic costs associated with" air and traffic impacts; and proceeded "without requiring the mitigation measures demanded by Caltrans," "without requiring . . . Zinkin to provide adequate mitigation for the cumulative traffic impacts caused by the other projects developed by him in the Friant Road expressway corridor," and "without supporting the alleged 'cost-benefit' analysis with quantified and credible substantial evidence."

Before the trial court ruled on the petition, Woodward Park voluntarily dismissed Caltrans as a party. It also "waive[d]" its "claim in this action, based upon inadequate mitigation for the future ramp improvements at State Highway 41 and Friant Road, as alleged in the First Cause of Action . . . ."

In its ruling, the trial court first stated that Woodward Park had withdrawn its first cause of action. Although the fifth cause of action also referred to traffic impacts, the court interpreted the withdrawal of the first as "waiv[ing] any claims based on inadequate mitigation of traffic impacts relating to the approved project."

On the second cause of action (relating to air impacts), the court concluded that the EIR's analysis was adequate. It found that the EIR examined the region's air pollution conditions and the pertinent regulatory standards; "discusse[d] . . . and analyze[d] the pollutants likely to be created by the project"; considered the project's cumulative impact on regional air quality; "acknowledge[d] the known connection between many of the pollutants likely to be created by the project, and serious health consequences, including the connection between: ozone emissions and impaired respiratory function, $PM_{10}$ particulates and lung damage, carbon monoxide and cardiovascular disease, and nitrogen dioxide and its adverse effects on human respiratory and immune systems." The court noted that "[t]he EIR conclude[d] that pollutants created by the project will not exceed regional state and federal emissions standards, but acknowledge[d] that the cumulative impact on regional air quality is significant and largely unavoidable." This was adequate, the court ruled: "Whatever else might have been said about the health effects of reduced air quality, the EIR provides adequate notice to the lead agency, other public agencies and the general public of the health consequences which may result from adding more pollutants to a nonattainment basin."

On the third cause of action (inadequate consideration of project alternatives), the court found that the EIR evaluated reasonable alternatives and the city had no obligation to consider an alternative with more housing because there was no evidence that more housing would reduce any environmental impacts. Woodward Park's "conclusion that an alternative project with a greater number of residential units than that approved could substantially lessen any such environmental effects is wholly without support in the administrative record."

Ruling against Woodward Park on its fourth cause of action (general plan inconsistency), the court observed that the reference in the general plan to 20 to 50 percent housing in mixed-use developments is an advisory guideline, not a binding requirement. The 20-to-50-percent figure is set forth in a model ordinance included in a document called "Landscape of Choice—Principles & Strategies," which in turn was adopted as an exhibit to the general plan. Policy C-8-b of the general plan "encourages the use of that Model Ordinance in the development of mixed use projects," but "makes clear that the Ordinance itself is only a guide for such development."

Finally, the court ruled against Woodward Park on its fifth cause of action (inadequate analysis in statement of overriding considerations) on the ground that statements of overriding considerations are not required to be quantitative in nature. Often, it stated, adequate overriding considerations "are generalized reasons for approving a project, such as creating more jobs, generating taxes and the like." CEQA requires that an agency "weigh and balance the economic and other benefits of the project against its environmental risks," but demands "no cost-benefit analysis" and does not compel an agency "to quantify the adverse environmental effects of a project, in terms of cost . . . ." According to the court, the statement "[set] forth the City's findings as to the significant and unavoidable effects of the project, including the cumulative effects on air quality in the Valley, and the City's determination that the project was acceptable, in spite of those unavoidable effects, because of the economic and other benefits of the project." This determination was supported by substantial evidence, the court ruled, so the statement was adequate. Having rejected all of Woodward Park's claims, the court denied the petition.

In its opening brief on appeal, Woodward Park again narrowed the issues, limiting its contentions to its second (air impacts), fourth (general plan inconsistency), and fifth (analysis in statement of overriding considerations) causes of action. In its discussion of air impacts, the brief argues that the EIR failed "to analyze adequately the cumulative impacts to air quality," and more specifically that it did not "correlate the acknowledged adverse impacts to air quality to resultant adverse health effects . . . ." Regarding plan consistency, Woodward Park contends that the 20-to-50-percent-housing reference in documents annexed to the general plan is a binding rule, not an advisory guideline. The brief's discussion of the statement of overriding considerations reiterates both the general contentions that the statement lacked sufficient "weighing and balancing" and was unsupported by substantial evidence and the more specific claim that the statement lacked "quantification" of costs arising from traffic congestion and air-pollution-induced health impacts. The city and Zinkin, in separate briefs, undertook to rebut these contentions. On the day Woodward Park's reply brief was due, its counsel informed the clerk's office that he would be filing the brief as soon as he could. The reply brief was never filed.

Subsequently, we issued a briefing letter, asking the parties to submit supplemental briefs addressing five issues: (A) By measuring the project's impacts against the impacts of a large office park allowable under existing zoning, rather than a vacant lot, did the EIR choose an environmental baseline that was incorrect as a matter of law? (B) By defining the no-project alternative as a large office park allowable under existing zoning, rather than a vacant lot, did the EIR define the no-project alternative incorrectly as a matter of law? (C) When the statement of overriding considerations based its

finding of overriding economic benefits on a misdescription of the project alternatives considered in the EIR, did the statement fatally compromise its integrity as an informational document and were its findings unsupported by substantial evidence? (D) Was the city's refusal[4] to require feasible mitigation measures for acknowledged freeway traffic impacts erroneous as a matter of law, and is the error cognizable under the fifth cause of action even though the first was withdrawn? (E) Did Woodward Park fail to exhaust administrative remedies with respect to the foregoing issues or fail to take action in the trial court to preserve them for appeal? Woodward Park, the city, and Zinkin submitted supplemental briefs addressing these issues.

## *DISCUSSION*

*Standards of review*

If a CEQA petition challenges agency action that is quasi-adjudicatory in character, the trial court's role is only to determine whether the action is supported by substantial evidence in the record. (§ 21168.) If the agency action was quasi-legislative in character, the trial court reviews the action for abuse of discretion. The agency abuses its discretion if it does not proceed in the manner required by law or if the decision is not supported by substantial evidence. (§ 21168.5.) " 'Substantial evidence' " is defined in the Guidelines as "enough relevant information and reasonable inferences from this information that a fair argument can be made to support a conclusion, even though other conclusions might also be reached." (Guidelines, § 15384, subd. (a).) The formulations in sections 21168 and 21168.5 embody essentially the same standard of review. Both require the trial court to determine whether the agency acted in a manner contrary to law and whether its determinations were supported by substantial evidence, and neither permits the court to make its own factual findings. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1988) 47 Cal.3d 376, 392, fn. 5 [253 Cal.Rptr. 426, 764 P.2d 278]; *Burbank-Glendale-Pasadena Airport Authority v. Hensler* (1991) 233 Cal.App.3d 577, 589–590 [284 Cal.Rptr. 498].) The Court of Appeal reviews the trial court's decision de novo, applying the same standards to the agency's action as the trial court applies. (*Neighbors of Cavitt Ranch v. County of Placer* (2003) 106 Cal.App.4th 1092, 1100 [131 Cal.Rptr.2d 379].)

---

[4] As noted in footnote 3 above, the parties supplied no citation to the record showing that any freeway-related measure was included in the city council's resolution certifying the EIR until after this court filed its original opinion in this case.

A similarly deferential standard is applicable to Woodward Park's claim under Government Code section 65300.5. The city's determination that the project was consistent with the general plan and the Woodward Park Community Plan can be overturned by a reviewing court only if the city abused its discretion. It abused its discretion only if its determination was not based on findings or the findings were not based on substantial evidence. (*Families Unafraid to Uphold Rural etc. County v. Board of Supervisors* (1998) 62 Cal.App.4th 1332, 1338 [74 Cal.Rptr.2d 1].)

## I. *Foundational defects in the environmental documents*

■ The city approved two environmental documents, an EIR and a statement of overriding considerations. The EIR has often been called the heart of CEQA. (*Laurel Heights Improvement Assn. v. Regents of University of California* (1993) 6 Cal.4th 1112, 1123 [26 Cal.Rptr.2d 231, 864 P.2d 502].) It is an informational document whose purpose is to inform the public and decision makers of the environmental consequences of agency decisions before they are made. (*Ibid.*) Beyond this informational purpose, an EIR can lead to affirmative legal obligations for agencies: They are required to "mitigate or avoid the significant effects on the environment" identified in an EIR "whenever it is feasible to do so" if they approve projects that have significant effects. (§ 21002.1, subd. (b).) Agencies are permitted to approve projects with significant environmental impacts, even if there are no feasible mitigation measures, if they find that overriding considerations justify the approval. Those considerations must be set forth in a statement of overriding considerations and supported by substantial evidence. (§ 21081; Guidelines, § 15093.) ■ Both documents were fundamentally defective in this case and failed to satisfy legal requirements.

### A. *Environmental baseline*

#### 1. *Applicable law*

■ The Guidelines state that an EIR must contain a description of the environmental setting of the project and that this description must describe the actual physical conditions of the project site when the notice of preparation of the EIR is published. Further, and crucially in this case, the existing physical conditions "will normally constitute the baseline physical conditions by which a lead agency determines whether an impact is significant." (Guidelines, § 15125, subd. (a).) Also, "[w]here a proposed project is compared with an adopted plan, the analysis shall examine the existing physical conditions at the time the notice of preparation is published . . . as well as the

potential future conditions discussed in the plan." (Guidelines, § 15125, subd. (e).) These requirements protect the fundamental essence of an EIR, its evaluation of a project's environmental impacts. They protect this, in cases where the proposed project is actual construction, by ensuring that the evaluation of impacts normally will do what common sense says it should do and what the EIR's most important audience, the public, will naturally assume it does: compare what will happen if the project is built with what will happen if the site is left alone.

To put the point a bit differently: If an EIR for a construction project on vacant land uses something other than vacant land as its baseline, the EIR will report only a portion of the impacts the project will have. For instance, if a hypothetical project half the size of the proposed project is used as a baseline, the EIR will report only half the project's impact. The EIR would fail to inform the public of the other half. It would also necessarily lack consideration of mitigation measures for the omitted portion of the project's impact.

### 2. *Analysis: actual vacant land versus hypothetical office park*

In this case, the EIR acknowledged that the project site was presently a vacant lot. It then went on in many instances, however, to evaluate environmental impacts by comparing the project's impacts with those of the maximum buildable development under existing zoning and plan designations. The question presented is whether this approach satisfied the requirement that the EIR evaluate impacts by comparing the project to existing physical conditions.

The city and Zinkin contend that the EIR conformed to the Guidelines because it evaluated the proposed project's impacts in relation to *both* a vacant lot *and* a large development permissible under existing zoning and plan designations. If the EIR actually did this, its treatment of the baseline would be legally correct. Where, as here, the agency's action includes alteration of a previously adopted plan, the EIR (normally) still must compare the project with "existing physical conditions" but should also compare it with "potential future conditions discussed in the plan." (Guidelines, § 15125, subd. (e).) The second comparison is important because, among other reasons, it enables the public and decision makers to identify possible inconsistencies between the proposed project and the previously adopted plan. (See discussion foll. Guidelines, § 15125.)

This "two-baselines approach" only works if the EIR actually carries out both comparisons. That did not happen in this case. Instead, the EIR had a dominant theme of comparing the proposed project with buildout under

existing zoning, combined with a scattered, partial discussion of some of the project's impacts relative to vacant land.

As we have said, the EIR's traffic discussion did include a comparison of existing traffic with existing traffic plus project-generated traffic. It contained a description of existing air pollution. It also referenced a vacant lot as the point of comparison in describing some of the project's minor impacts. For example, it stated that the project will have an unavoidable aesthetic impact because it will look different from a vacant lot, and its discussion of impacts on biotic resources implicitly compared the project with a vacant lot by considering the need to remove and relocate certain species, if found.

Despite this, the EIR's bottom-line conclusions on the major impacts at issue emphasized the marginally increased impacts of the proposed project over buildout under existing zoning. The section of the air pollution discussion labeled "Impacts" set forth tables comparing air pollution that would be caused by buildout under existing zoning with pollution that would be caused by the proposed project. It then says the operation of the project would produce "slightly" more air pollution than the large office park allowable under existing zoning, without saying whether the increase is more than slight relative to the vacant land. In the traffic discussion, a repeated emphasis is that by some measures the proposed project would generate *less* traffic than a project buildable under existing zoning and plan designations. In several places, it is stated that, while existing designations for the project site included a cap of 12,400 trips per day, the proposed project was projected to generate only 12,297 trips per day, so building the project would reduce traffic by that measure. Tellingly, however, the EIR stated in another section that the no-project alternative—which the EIR also defined as a large office park buildable under existing zoning—might generate "about 1/2 the daily trips" the project would generate. This means that, although the proposed project's trip generation will come in under the 12,400-trip cap, a development allowed under existing zoning would come in *well* under that cap. In effect, the EIR used the trip cap as a *third* baseline to make the project's impacts look even smaller than the development-under-existing-zoning baseline did. Elsewhere, the EIR found that the project would generate less peak-hour traffic than a project buildable under existing zoning. In any event, this thinking is obviously not based on a comparison of the proposed project with a vacant lot.

The upshot of all this is that the EIR never presented a clear or a complete description of the project's impacts compared with the effects of leaving the land in its existing state. Readers who have been told that the air pollution

impact is slight and that the traffic generated will be less than the given benchmark should not have to stop and puzzle it out that these conclusions are based on a comparison with a large office park that is not, in fact, there. Those who did puzzle it out were still left wondering whether the impacts would be slight or major in relation to vacant land.

Due to these problems, the EIR in this case is closely analogous to two EIR's the Court of Appeal found to be legally inadequate in *Environmental Planning & Information Council v. County of El Dorado* (1982) 131 Cal.App.3d 350 [182 Cal.Rptr. 317] (*EPIC*). One area of a county had 418 residents and another had 3,800. (*Id.* at p. 358.) The existing county general plan established a population-holding capacity for the first area of 70,400 and for the second of 63,600. A proposed plan amendment would have reduced the capacity figures to 5,800 and 22,400. The EIR's described the proposed plan amendment's impacts by saying that the drastic reductions in the population-capacity figures meant the adoption of the amendment would have no adverse environmental impacts. (*Id.* at pp. 357–358.)

The appellate court found the EIR's deficient because they should have compared the plan amendment to the existing state of the physical environment, not to the existing plan. "CEQA nowhere calls for evaluation of the impacts of a proposed project on an existing general plan; it concerns itself with the impacts of the project on the environment, defined as the existing physical conditions in the affected area. The legislation evinces no interest in the effects of proposed general plan amendments on an existing general plan, but instead has clearly expressed concern with the effects of projects on the actual environment upon which the proposal will operate." (*EPIC, supra*, 131 Cal.App.3d at p. 354.) Since the EIR's at issue compared the amendments with hypothetical conditions contemplated by the existing plan and not with actual existing physical conditions, those EIR's "can only mislead the public as to the reality of the impacts and subvert full consideration of the actual environmental impacts which would result." (*Id.* at p. 358.) A point of similarity between *EPIC* and the present case is that there, as here, it was "true that the [EIR's] do discuss certain physical impacts upon the existing environment, but such information must be painstakingly ferreted out of the [EIR's]." (*Id.* at p. 357.)

A number of other cases reach similar conclusions. (See, e.g., *City of Carmel-by-the-Sea v. Board of Supervisors* (1986) 183 Cal.App.3d 229, 246 [227 Cal.Rptr. 899] [agency must consider impacts of rezoning on existing physical environment; comparison of project possible under old zoning with project possible under proposed new zoning "bears no relation to real conditions on the ground"].) As a popular CEQA treatise describes them, *EPIC* and similar cases "hold that, in assessing the impacts of a project proposed

for an undeveloped piece of property, agencies should compare project impacts against the *existing environment*, rather than some hypothetical, impacted future environment that might occur without the project under existing general plan and/or zoning designations." (Remy et al., Guide to the Cal. Environmental Quality Act (10th ed. 1999) p. 165 (hereafter Remy).) As in *EPIC*, the EIR here was legally inadequate as an informational document because it failed to analyze consistently and coherently the impacts of the project relative to leaving the land in its existing physical condition.

The city makes an alternative argument that, even if it did not sufficiently analyze the project's impacts relative to existing physical conditions, it had discretion not to do so. The proposition that an agency sometimes can choose a baseline other than existing physical conditions is implicit in the Guideline's statement that existing physical conditions are "normally" the baseline. Even so, in this case, neither the city nor Zinkin has advanced any reason why the normal approach was not required here. If *EPIC* represents the normal situation—and there is every reason to think it does, since it is cited as authority for the Guideline in question (see Discussion following Guidelines, § 15125)—we would need some persuasive reason not to apply *EPIC*. The city says *EPIC* is "inapt" because here the EIR did contain some references to existing conditions. As we have just seen, the EIR's in *EPIC* did also, but that was not enough where the main thrust was a comparison of the proposed project with hypothetical conditions that were allowed under the existing general plan.

The city cites *Fat v. County of Sacramento* (2002) 97 Cal.App.4th 1270 [119 Cal.Rptr.2d 402], but that case does not present an analogous situation. There, the question was whether an agency that *did* use existing physical conditions as the environmental baseline in an EIR was required *not* to do so because those conditions resulted from previous illegal construction. The Court of Appeal held that the agency acted within its discretion in using existing physical conditions as the baseline. (*Id.* at p. 1278.)

Situations appearing in the case law that were treated as not "normal" are not comparable to the present case. (*Black Property Owners Assn. v. City of Berkeley* (1994) 22 Cal.App.4th 974, 985–986 [28 Cal.Rptr.2d 305] [EIR reviewing update of housing element of general plan, not involving approval of any specific construction, could take preexisting policies readopted without change as part of baseline]; *Benton v. Board of Supervisors* (1991) 226 Cal.App.3d 1467, 1477, fn. 10 [277 Cal.Rptr. 481] [supplemental EIR prepared because of changes in previously reviewed and approved project could use project as approved in original EIR as environmental baseline].) There was no reason here why the usual rule requiring the baseline to be the existing physical environment would not apply.

The city and Zinkin finally claim that the EIR did not have to use existing physical conditions as the baseline because previous environmental review of the property for other purposes "analyzed impacts to the site 'from the dirt up.' " Previous review mentioned by the city and Zinkin includes the 1990 rezoning and plan amendments and an EIR prepared for the 1989 Woodward Park Community Plan. We do not see how environmental review occurring years before the present project was conceived affects the question of what the baseline should have been in the EIR for the present project. The suggestion appears to be that members of the public could (1) retrieve the environmental documents prepared on those earlier occasions; (2) locate analyses that evaluated impacts by comparing the vacant land with whatever plans or projects those earlier processes approved, and then (3) add those impacts to the impacts identified in the present EIR. The sum of the earlier identified impacts and those identified now would be the actual impacts of the present project based on a comparison with vacant land. Even assuming this would have been possible, an agency cannot satisfy its CEQA obligations by imposing a burden of that kind on the public. The notion that it could is unsupported by authority and inconsistent with the axiom that an EIR's basic purpose is to inform. It is significant, also, that the *city and Zinkin do not even claim that there is a prior EIR for a project on this property*. The Woodward Park Community Plan EIR pertained to a community plan, not a specific construction project. There is no indication in the record that any EIR was certified for the 1990 rezoning and plan amendments. The EIR here failed to use the existing physical environment as the environmental baseline, and none of the city's or Zinkin's arguments show that any other baseline was permissible.

### 3. *Exhaustion and preservation*

The city and Zinkin argue that the baseline issue was never raised in the agency proceedings or in the trial court, so Woodward Park has not exhausted its administrative remedies and the issue is not preserved for appeal. We disagree.

### *Exhaustion of administrative remedies*

Before a petitioner can assert a CEQA violation against an agency in court, someone—not necessarily the petitioner—must raise the same issue before the agency in the administrative proceedings. (§ 21177, subd. (a).) The petitioner itself need only have raised *some* objection before the agency (§ 21177, subd. (b)); if it has, it may then litigate any issue raised before the agency by anyone. The claimed violation and the evidence on which it is

based must have been raised by someone in the administrative forum. (*Barthelemy v. Chino Basin Mun. Water Dist.* (1995) 38 Cal.App.4th 1609, 1620–1621 [45 Cal.Rptr.2d 688].) Even so, "less specificity is required to preserve an issue for appeal in an administrative proceeding than in a judicial proceeding," since citizens are not expected to bring legal expertise to the administrative proceeding. (*Citizens Assn. for Sensible Development of Bishop Area v. County of Inyo* (1985) 172 Cal.App.3d 151, 163 [217 Cal.Rptr. 893].) Where there was no public hearing or other opportunity for the public to raise objections, the exhaustion requirement does not apply at all. (§ 21177, subd. (e).) The purpose of the exhaustion doctrine is to give the agency an opportunity to respond to specific objections before those objections are subjected to judicial review. (*Park Area Neighbors v. Town of Fairfax* (1994) 29 Cal.App.4th 1442, 1449 [35 Cal.Rptr.2d 334].)

The baseline issue was fairly raised by the comment letter submitted by Caltrans in response to the notice of preparation. The letter stated: "Using a full buildout residential development as a 'no build' scenario is also inaccurate. In order to be accurate for this Air Quality Impact Assessment, the 'no build' scenario should reflect current conditions (vacant lot) should the property not be developed, compare to [buildout] of current zoning with residential and then finally compare to [buildout] with mixed use development." The writer should have referred to a full [buildout] *office* development instead of a residential one, but other than that, his comment captures the essence of this issue. The same letter made the point that the city should not refuse to mitigate freeway traffic impacts on the ground that buildout under existing zoning would cause more peak-hour trips because that was not the relevant point of comparison. This also raised the substance of the baseline issue. Petitioners' administrative remedies were exhausted on this issue.

### Preservation of issue for appeal

As a general rule, an appellate court will not review an issue that was not raised by some proper method by a party in the trial court. (9 Witkin, Cal. Procedure (4th ed. 1997) Appeal, § 394, p. 444.) It is important to remember, however, that the purpose of this general rule is to give the trial court and parties an opportunity to correct an error that *could* be corrected by some means short of an opposite outcome in the trial court. A "noncurable defect of substance where the question is one of law" is not an error that falls within the rule. A "matter involving the public interest or the due administration of justice" also is not. (*Id.* at p. 450.) Here, the baseline issue we have just discussed falls within both of these exceptions.

*United California Bank v. Bottler* (1971) 16 Cal.App.3d 610 [94 Cal.Rptr. 227] illustrates the point. The trial court there entered an order directing that if a testator's daughter should have no living descendants at the time of her death, the remainder of the assets devised to her in trust by the testator (her father) pursuant to a power of appointment would be distributed to the heirs of her grandfather, who originally created the power of appointment. (*Id.* at pp. 613–615.) Holding that this result violated the rule against perpetuities, the Court of Appeal reversed. (*Id.* at pp. 616–618.) It did not matter that no party raised the perpetuities issue in the trial court: "It does not appear that the perpetuities problem was ever brought to the attention of the trial court. Appellant raises it for the first time in her brief in this court. Since the rule [against perpetuities] is based upon public policy rather than private convenience, we cannot invoke any doctrine of waiver, but must face the issue and apply the limitation which the law imposes." (*United California Bank v. Bottler, supra*, 16 Cal.App.3d at p. 616.)

The Court of Appeal in *Bayside Timber Co. v. Board of Supervisors* (1971) 20 Cal.App.3d 1 [97 Cal.Rptr. 431] (*Bayside*) made a similar point. The trial court issued a writ of mandate compelling a county to issue a permit to a timber company to grade a logging road. It ruled that a state law, the Z'berg-Nejedly Forest Practice Act of 1973 (Pub. Resources Code, § 4511 et seq.), preempted local regulation. (*Bayside, supra*, at pp. 3–4.) The Court of Appeal reversed, holding that the Forest Practice Act violated the state and federal Constitutions. (*Bayside, supra*, at p. 14.) The constitutional issue was raised for the first time on appeal. The court considered and ruled on the merits of the issue anyway, observing that issues raised for the first time on appeal are often considered if they relate to questions of law only, especially "where the public interest or public policy is involved." (*Id.* at p. 5.) The court concluded that regulation of the logging industry was of great interest to the public, so the case was within the exception for pure questions of law relating to the public interest. (*Id.* at p. 6.)

There are many other examples. (See, e.g., *Hale v. Morgan* (1978) 22 Cal.3d 388, 394 [149 Cal.Rptr. 375, 584 P.2d 512] [constitutional issue of great public interest raised for first time on appeal]; *Bonner v. City of Santa Ana* (1996) 45 Cal.App.4th 1465, 1476 [53 Cal.Rptr.2d 671] [recoverability of money damages for violations of state due process and equal protection clauses raised for first time on appeal], overruled on other grounds by *Katzberg v. Regents of University of California* (2002) 29 Cal.4th 300, 320 [127 Cal.Rptr.2d 482, 58 P.3d 339]; *In re Marriage of Weaver* (1990) 224 Cal.App.3d 478, 488 [273 Cal.Rptr. 696] [clear-and-convincing-evidence standard must be applied to claim of transmutation from separate to community property; issue raised for first time on appeal].)

We conclude that the issue we are now considering falls within the exceptions. The question is whether the environmental documents were adequate as a matter of law. This is, of course, a question of law. It is also an error the trial court could not have cured. The defects in the environmental documents were fixed and there was nothing the court or parties could do about them. If Woodward Park had advanced this issue in a more detailed way, the trial court could have responded correctly only by granting the writ. Further, the determination of whether the agency has complied with CEQA before approving a major development project in a densely populated area is an issue of public interest. To refuse to entertain this issue would not advance the purposes of the preservation doctrine.

The parties' failure to raise the issue in their original appellate briefs does not bar our consideration of it if the parties have had a fair opportunity to present their positions. (See *Wong v. Di Grazia* (1963) 60 Cal.2d 525, 532, fn. 9 [35 Cal.Rptr. 241, 386 P.2d 817] [parties missed rule-against-perpetuities issue in their briefs but Court of Appeal raised it at oral argument; "the issue . . . [is of] considerable public interest; it has been fully argued before this court [i.e., the Supreme Court]; we, accordingly, dispose of the issue on its merits"].) This issue was raised in our briefing letter and the parties submitted supplemental briefs addressing it. In sum, the issue is an appropriate one to address on appeal.

### B. *No-project alternative*

The no-project alternative employed in the EIR presents a similar question. In circumstances like these, the no-project alternative should discuss both the existing physical conditions and likely future conditions under the existing zoning and plan designations, and the city argues that this is just what happened. In reality, the EIR's no-project discussion mentioned the property's vacant status briefly and then focused all its analysis on the maximum allowable project under existing designations. If the EIR's impact analyses had been based on the correct *baseline*—existing physical conditions—we might conclude that the city acted within its discretion in minimizing the examination of existing physical conditions in the *no-project* discussion, since a comparison of the project with existing physical conditions would already be in the document. As we have just explained, the EIR did not use existing physical conditions as the baseline. This being so, we conclude that the no-project discussion was inadequate as a matter of law because it considered buildout under existing designations almost to the exclusion of existing physical conditions.

1. *Applicable law*

■ The Guidelines set out the dual character of the no-project alternative in situations where some other future development is likely under existing designations if the present project is disapproved: "The 'no project' analysis shall discuss the existing conditions at the time the notice of preparation is published . . . as well as what would be reasonably expected to occur in the foreseeable future if the project were not approved, based on current plans and consistent with available infrastructure and community services." (Guidelines, § 15126.6, subd. (e)(2).) More pointedly, where the project is "a development project on identifiable property," the following applies: "[T]he 'no project' alternative is the circumstance under which the project does not proceed. Here the discussion would compare the environmental effects of the property remaining in its existing state against environmental effects which would occur if the project is approved. If disapproval of the project under consideration would result in predictable actions by others, such as the proposal of some other project, this 'no project' consequence should be discussed. In certain instances, the no project alternative means 'no build' wherein the existing environmental setting is maintained. However, where failure to proceed with the project will not result in preservation of existing environmental conditions, the analysis should identify the practical result of the project's non-approval and not create and analyze a set of artificial assumptions that would be required to preserve the existing physical environment." (Guidelines, § 15126.6, subd. (e)(3)(B).) The Guidelines state that the no-project alternative is not necessarily the same as the environmental baseline. (Guidelines, § 15126.6, subd. (e)(1).)

Environmental treatise writers have recognized that, as a practical matter, these provisions mean the no-project discussion will often be primarily devoted to comparing the proposed project to a project that could be built under existing zoning and plan designations even though the baseline is existing physical conditions. The Guidelines have repudiated "the proposition that the analysis of the 'no project' alternative in an EIR 'must describe maintenance of the existing environment as a basis for comparison of the suggested alternatives to the status quo.' " (Remy, *supra*, at p. 169.) One treatise even suggests that when a project is a plan revision, the labor should simply be divided between the baseline-impacts discussion and the no-project discussion. The baseline-impacts discussion should be based on existing physical conditions and the no-project discussion on hypothetical buildout under the existing plan. "[W]hen a project consists of the revision of a plan or policy, the project's impacts are assessed against [a baseline of] existing conditions, and future conditions under the existing plan are treated as a 'no-project' alternative." (1 Kostka & Zischke, Practice Under the Cal. Environmental Quality Act (Cont.Ed.Bar 2006) § 13.12, p. 638.)

### 2. Analysis: failure to address existing conditions adequately anywhere in the EIR

Here, the agency chose to push the envelope in both discussions, shoving existing physical conditions to the margin in both its measurement of impacts against a baseline and its consideration of the no-project alternative. Although a no-project discussion heavily dominated by consideration of buildout under existing designations might have been proper in an EIR where the baseline was existing physical conditions, that was not the baseline used here. The Guidelines on the no-project alternative do require attention to existing physical conditions "as well as" to hypothetical future developments under existing plans. (Guidelines, § 15126.6, subd. (e)(2).) Due to the fact this attention was not adequately paid *anywhere* in the EIR, we cannot say the no-project discussion was legally adequate.

### 3. Exhaustion and preservation

The city and Zinkin argue that Woodward Park failed to exhaust administrative remedies with respect to this issue and that it has not been preserved for appeal. Again, we disagree.

#### Exhaustion of administrative remedies

Administrative remedies were exhausted on this issue. As our discussion has shown, the question is closely related to the environmental baseline. The comment letter from Caltrans—saying that "[u]sing a full build–out . . . development as a 'no build' scenario is . . . inaccurate"—was sufficient to raise both issues before the city council. Further, it is apparent from the final EIR that the city took this letter as showing potential difficulties with the EIR's no-project definition. The final EIR added this clarification to its no-project discussion:

"The No Project alternative is considered office development according to existing zoning. CEQA Guidelines Section 15126.6 [(e)](3)(B) stipulates that if the proposed project is a development project on identifiable property, the 'no project' alternative will be the circumstance under which the project does not proceed. This section, however, also stipulates that where failure to proceed with the project will not result in preservation of the existing environment (i.e., vacant property) the analysis should identify the practical result of the project's non-approval.

"The project site is vacant and by-passed and has long been planned and zoned for office use. If the proposed project is denied, it is unlikely that the site will remain in its vacant condition and the future development of the site

will occur. As a result, the analysis in the [draft EIR] for the No Project Alternative is consistent with CEQA provisions."

This analysis is not correct for the reasons we have explained, but it does show that the city knew of objections and had an opportunity to correct the problem.

### Preservation of issue for appeal

The question of whether the EIR included a correct no-project analysis was a question of law, and the legal adequacy of the EIR unquestionably raises a matter of public interest. This means, for the reasons we discussed earlier, that it is appropriate to address the issue now even though it was raised for the first time on appeal. The parties were given an opportunity to file, and did file, supplemental briefs on the issue. Consequently, it is appropriate to consider the merits.

### C. Statement of overriding considerations

#### 1. Applicable law

■ An agency must adopt a statement of overriding considerations when it approves a project in spite of significant, unavoidable environmental impacts that cannot be sufficiently mitigated. (§ 21081, subd. (b); Guidelines, § 15093.) Overriding considerations contrast with mitigation and feasibility findings. They are "larger, more general reasons for approving the project, such as the need to create new jobs, provide housing, generate taxes, and the like." (*Concerned Citizens of South Central L.A. v. Los Angeles Unified School Dist.* (1994) 24 Cal.App.4th 826, 847 [29 Cal.Rptr.2d 492].) This does not mean, however, that an agency's unsupported claim that the project will confer general benefits is sufficient. The asserted overriding considerations must be supported by substantial evidence in the final EIR or somewhere in the record. (*Sierra Club v. Contra Costa County* (1992) 10 Cal.App.4th 1212, 1223 [13 Cal.Rptr.2d 182]; Guidelines, § 15093, subd. (b).)

#### 2. Analysis: misrepresentation of project alternatives

■ A statement of overriding considerations is similar to findings in an EIR in that it needs to be supported by substantial evidence in the record. An EIR is also required to make a " 'good-faith effort' " to disclose the environmental impacts of a project to decision makers and the public. (*Berkeley Keep Jets Over the Bay Com. v. Board of Port Cmrs.* (2001) 91 Cal.App.4th 1344, 1355 [111 Cal.Rptr.2d 598]; see Guidelines, § 15151.) An EIR vindicates the "right of the public to be informed in such a way that it can intelligently weigh the environmental consequences" of a proposed project (*Karlson v. City of Camarillo* (1980) 100 Cal.App.3d 789, 804 [161 Cal.Rptr. 260]). Further,

an appellate court is required to determine the EIR's "sufficiency as an informative document." (*County of Inyo v. City of Los Angeles* (1977) 71 Cal.App.3d 185, 189 [139 Cal.Rptr. 396].)

We believe a statement of overriding considerations, like an EIR, must make a good faith effort to inform the public. In *Sierra Club v. Contra Costa County, supra*, 10 Cal.App.4th at page 1223, the court acknowledged that a statement of overriding considerations represents an agency's policy decision, but concluded that it still must have a foundation in the record. Likewise, the statement's status as a policy judgment does not insulate it from CEQA's central demand that environmental decisions be made after the public and decision makers have been informed of their consequences and the reasons for and against them. The statement's purposes are undermined if its conclusions are based on misrepresentations of the contents of the EIR or it misleads the reader about the relative magnitude of the impacts and benefits the agency has considered.

The statement of overriding considerations adopted in this case was inadequate for these types of reasons. The EIR described the project alternatives as developments that were as large as, or larger than, the proposed project. To the contrary, the statement of overriding considerations said the proposed project had superior economic benefits because the alternatives "generally propose no development or development to a lesser degree" and "primarily provide for developments of a reduced intensity or no development." Having minimized the appearance of the proposed project's impacts by packing the EIR with intensive project alternatives whose environmental advantages were few, the city was confronted with the other side of the coin. These large alternatives likely would have economic benefits of comparable magnitude to the proposed project and the balance would be close. In effect, by inaccurately describing the project alternatives as "no development or development to a lesser degree," the statement applied a thumb to the scale.

The inevitable effect of describing the alternatives as intensive developments in the EIR and then characterizing them as smaller or nonexistent developments in the statement of overriding considerations was to mislead the public and decision makers about the project's advantages and disadvantages. The end result is that the statement did not serve its mandated purpose as an informational document.

In reality, the primary difference between the proposed project and the project alternatives described in the EIR was that the proposed project had a shopping center while the alternatives had no shopping center or a smaller one. The alternatives more than made up the resulting difference in square footage by adding more office and office-related retail space. If the statement

of overriding considerations had said accurately that the alternatives proposed "no shopping center or a smaller shopping center" instead of inaccurately "no development or development to a lesser degree," it would have made a far different impression on the public. We do not have to look far to find a reason why the city might not have wanted to use the accurate language since many project opponents, especially neighbors, concentrated their fire on the shopping center component of the project.

In addition, the city's claim of superior economic benefits was not supported by substantial evidence in the record. Nothing in the EIR or in the record supports the claim that the project would generate more economic activity than the equally large project alternatives.

The city has anticipated the possibility that one of its claimed overriding considerations could be struck down by asserting the sufficiency of each standing alone. The statement of overriding considerations says "the benefits identified below are each one, in and of themselves, sufficient to make a determination that the adverse environmental effects are acceptable." The statement's other claim is that the proposed project will provide a greater *variety* of economic activity—not just a greater quantity. "The other alternatives would offer a lesser variety of employment opportunities, less available services for the community and less available housing"; "[t]he benefits of providing a mixed use development with a diverse variety of office uses together with commercial goods and services and residential uses within a given neighborhood would be reduced with any of the proposed alternatives"; the alternatives would provide "a lesser range of employment opportunities . . . ."

For starters, the claim about housing is not·supported by sufficient evidence. The city admits that the 20 apartments in the proposal are speculative—only a "place-holder"—and that one of the project alternatives proposed far more apartments (135).

We will leave that claim aside and focus on what remains of the statement's finding about variety of economic activity. Stripping away the excess verbiage, this finding is that some of the economic benefits of the proposed project would arise from retail goods and retail jobs at the shopping center, while the economic benefits of the alternatives would arise from other activities. This leads to the question of whether substantial evidence in the record supported the idea that a development with offices and a shopping center necessarily has a greater variety of economic activity than a development with offices and office-related retail space. We need not answer that question, however. If the essential claim of the statement of overriding considerations was that a development with a shopping center is economically better for the community than any feasible alternative development of comparable size, the statement was fundamentally misleading. Any

claim about the special economic virtues of shopping centers was buried in obfuscatory language, such as "[t]he benefits of providing a mixed use development with a diverse variety of office uses together with commercial goods and services and residential uses within a given neighborhood would be reduced with any of the proposed alternatives." In sum, if the basis of the decision was something special about shopping centers, the statement effectively concealed that basis from the reader. "There is a sort of grand design in CEQA: Projects which significantly affect the environment *can* go forward, but only after the elected decision makers have their noses rubbed in those environmental effects, and vote to go forward anyway." (*Vedanta Society of So. California v. California Quartet, Ltd.* (2000) 84 Cal.App.4th 517, 530 [100 Cal.Rptr.2d 889].) The statement of overriding considerations does not even come close to rubbing anyone's nose in the facts. Although we agree with the contention of the city and Zinkin that the statement was not required to contain a quantitative fiscal analysis of the economic costs and benefits of the project, it still must contain a weighing and balancing analysis not dependent on assumptions contradicted by the EIR.

### 3. *Exhaustion and preservation*

We are satisfied that Woodward Park exhausted its administrative remedies with respect to the statement of overriding considerations and that it is appropriate to reach the merits of this issue on appeal.

### *Exhaustion of administrative remedies*

There is no evidence in the record that the statement of overriding considerations was made available to the public before the day of the city council meeting at which it was adopted. No draft statement is attached to the draft EIR's that were distributed to the public earlier in the process. At least two of the comment letters stated that there were no overriding considerations mentioned in the final circulated version of the EIR. As far as we can tell from the record, the public had only the day of the meeting to review and analyze the statement. Under these circumstances, it is uncertain whether the exhaustion requirement even applies to objections to the statement of overriding considerations. Assuming it does, where the agency's own action severely limited the public's opportunity to review and analyze the document, it would be antithetical to the purposes of CEQA to require the public to articulate precise factual and legal objections to the statement as a precondition to litigating those issues. A more general enunciation of issues related to the statement, sufficient to put the agency on notice that the document may not satisfy legal requirements, is adequate to exhaust administrative remedies.

In light of this, the objections that were raised to the statement of overriding considerations at the city council meeting were sufficient.

Woodward Park's attorney observed that "the most significant thing in your overriding considerations is that you make a finding or purport to make a finding in your resolution that you've weighed and balanced the detriments caused by the environmental impact which are acknowledged as unavoidable and significant air quality and traffic congestion." A discussion during the meeting between Councilmember Boyajian and Planning Manager Haro explored the merits and demerits of the statement in some detail, however:

"Boyajian[:] What's basically the overriding consideration, why we need a new, another shopping center in this area based on the fact that we don't, that we haven't really complied and we can't mitigate the environmental impact?

"Haro[:] Attached to your staff report Mr. Boyajian is Exhibit B, it's attached to the Resolution Certifying the Final EIR No. 10129. In Exhibit B you will find the Statement of Overriding Considerations for findings of significant and unavoidable impacts. The first listed finding related to this issue of Caltrans is called Transportation and Circulation. What those findings do is say they are overriding social and economic considerations and uh, that need to be considered in order to approve the project to override . . . .

"Boyajian[:] What does that, what does that mean, I don't understand the general . . .

"Haro[:] What that means is and if you look at the details and I'll summarize them for you . . .

"Boyajian[:] Yeah summarize them please.

"Haro[:] Summarize them for you? One of the overriding considerations, the same thing we've done for Armenian Town EIR, for the master EIR, for the general plan, is the economic job creation situation of this valley. That is an overriding consideration, legally acceptable under the CEQA guidelines.

"Boyajian[:] Ok the development's going to cause jobs?

"Haro[:] Development crea—land development creates jobs, that's correct.

"Boyajian[:] Ok.

"Haro[:] And the other overriding consideration that's really important in this case is that this project is not generating by the controls we've placed on them, any more traffic than is as it stands now and as it was approved in 1990.

. "Boyajian[:] Ok.

"Haro[:] 12,400 vehicle trips per day. That is a finding of fact that we've included in there.

"Boyajian[:] Ok. So basically those are the two overriding considerations.

"Haro[:] Those are the two major overriding considerations, that's correct."

Two things are significant about this conversation. First, it included a decision maker's skeptical questions about whether the statement coherently set forth the ultimate justifications for the project. This shows that the agency was made aware of potential problems in the statement at that fundamental level.

Second, the city staff member's response to the questions misrepresented the contents of the statement. The statement does not say the trip-generation estimate for the project (and a comparison of it with the trip cap previously approved) is an overriding consideration. Logically, it could not make that statement. The trip-generation estimate is a measurement of an environmental impact (or the lack of one) from the project. Overriding considerations are, by definition, not impacts or the lack of impacts. They are reasons for proceeding with a project despite impacts. What is more, the staff member's comment was very misleading in light of what the statement did, in reality, say about traffic: that the project would have a significant unavoidable adverse impact on traffic congestion in spite of the mitigating measures the city would be requiring.

The city staff member's comments reinforce our view that members of the public did all that was necessary to exhaust administrative remedies. The statement not only was presented to the public at the last possible moment—the same day the decision was made—but a city staff member undermined public efforts to understand the document in the short time available by misstating its contents at the meeting. This is even less understandable since it was city staff who prepared the statement.

For all these reasons, we conclude that administrative remedies were exhausted. Since the statement of overriding considerations was made available only a short time before the city council's vote, and because city staff's presentation of its contents at the meeting was misleading, the brief comments made about the statement at the meeting by members of the public and the council were enough to put the agency on notice. The purposes of the exhaustion doctrine—to allow an agency, sufficiently notified of objections by

an adequately notified public, to cope with those objections before litigation can occur—were served as well as they could be under the circumstances.

*Preservation of statement-of-overriding-considerations issue for appeal*

The issue of the adequacy of the statement of overriding considerations was not raised for the first time on appeal. Woodward Park challenged the statement in its fifth cause of action and the trial court ruled on that claim. Arguably, the issue raised by Woodward Park was not the same as the issue we have just discussed. In any event, we do not have to decide whether the relationship is close enough. The statement-of-overriding-considerations issue is as much a matter of law and of public interest as the EIR issues we discussed earlier. Addressing it even if raised for the first time on appeal is appropriate.

II. *Treatment of specific environmental issues*

In addition to the fundamental flaws in the environmental documents just discussed, the EIR's treatment of other environmental issues requires examination in this case.

A. *Traffic: "The Caltrans Freeway Mitigation Controversy"*

Perhaps the oddest component of this case is the issue Zinkin dubs the "Caltrans Freeway Mitigation Controversy." Continuing a long-standing practice, the city took the position during the CEQA review process that it need not require any form of mitigation for the project's impacts on freeway traffic—not because no impacts were identified, or the impacts were not significant, or mitigation was not feasible, but because the city has been dissatisfied with the performance of Caltrans in providing information and considers itself free to refuse to require mitigation so long as its dissatisfaction continues. Though the record shows that this has been a subject of vigorous debate over the years among the city, Caltrans, and opponents of development projects, the fundamental legal question it presents is not difficult. The city must require feasible mitigation measures for significant freeway traffic impacts, just as it must for other significant impacts.

At the last minute, the city decided to accept the developer's offer to pay voluntarily a small sum as a freeway impact mitigation fee; some confusing language regarding this payment was incorporated into the city council's resolution certifying the EIR. Because the amount was based on a calculation that ignored the most costly aspect of the project's freeway impact, the amount was not supported by substantial evidence. For this reason, the fee

was not an adequate mitigation measure under CEQA even assuming the language in the resolution constituted an enforceable mitigation measure.

### 1. *Applicable law*

■ An EIR must "identify and focus on" those environmental impacts of the project that it finds to be significant. (Guidelines, § 15126.2, subd. (a).) If the agency has determined that possible impacts are actually not significant, the EIR must make a finding to that effect. (Guidelines, § 15128.) The EIR also must describe feasible measures that could minimize significant impacts. (Guidelines, § 15126.4, subd. (a)(1).) If more than one mitigation measure is available, the EIR must discuss each and describe reasons for the measure or measures it selects. (Guidelines, § 15126.4, subd. (a)(1)(B).) If no mitigation measures are feasible, the EIR must say so. (Guidelines, § 15091, subd. (a)(3).) An EIR can find that the feasible measures available to avoid or mitigate a significant impact are within the jurisdiction of another agency which has adopted them or can and should adopt them. (Guidelines, § 15091, subd. (a)(2).) In any event, the EIR's findings must be supported by substantial evidence. (§ 21081.5.)

In sum, an agency is forbidden to approve a project unless it finds there are no significant impacts; or imposes mitigation measures for all significant impacts; or finds mitigation measures infeasible or within the jurisdiction of another agency. (§ 21081, subd. (a); Guidelines, § 15091, subd. (a).) If the EIR finds that there are significant impacts for which no mitigation measures are feasible, it must adopt a statement of overriding considerations before approving the project. (§ 21081, subd. (b); Guidelines, § 15093.)

There are two things an agency cannot do: It cannot acknowledge a significant impact, refuse to do or find anything else about it, and approve the project anyway. And it cannot acknowledge a significant impact and approve the project after imposing a mitigation measure not shown to be adequate by substantial evidence.

### 2. *Analysis: the city's practice regarding mitigation of traffic impacts*

The draft EIR dated July 2004 included a table that "identifie[d] the PM peak hour trips generated by the project that will impact various segments of the SR 41 mainline and interchanges at Friant and Herndon Avenues and the resulting fair share fee estimate by improvement. Caltrans identified the cost per peak hour trip in its comment letter dated June 1, 2004. The PM peak hour was used since more project trips affect SR 41 segments in the PM peak

than trips generated during the AM peak. AM and PM peak hour project-related trips were estimated using the Fresno COG [Council of Governments] Regional Traffic Model." The table showed a total fair share estimate of $31,155.

 The draft EIR then refused to require this or any other amount as mitigation on the ground that Caltrans had not provided information the city wanted. "It is noted that Caltrans did not provide a source document or 'nexus study' for the cost per trip by improvement or segment along SR 41 identified in [the table]. In the absence of such documentation by Caltrans, such fees have not been required as mitigation or conditions of approval by the City of Fresno." The term "nexus study" refers to a constitutional requirement described in *Nollan v. California Coastal Comm'n* (1987) 483 U.S. 825 [97 L.Ed.2d 677, 107 S.Ct. 3141]. As detailed in the Guidelines, this is the requirement that there "be an essential nexus (i.e. connection) between the mitigation measure and a legitimate governmental interest." (Guidelines, § 15126.4, subd. (a)(4)(A).) The Guidelines also require that mitigation measures be " 'roughly proportional' " to impacts, as required by *Dolan v. City of Tigard* (1994) 512 U.S. 374 [129 L.Ed.2d 304, 114 S.Ct. 2309]. (Guidelines, § 15126.4, subd. (a)(4)(B).)

As an alternative reason for requiring no mitigation, the draft EIR stated that the project would generate less traffic at peak hours than buildout under existing zoning: "Finally, the proposed project is expected to generate fewer AM or PM peak hour trips than allowed under current zoning estimated to be 489,000 square feet of general office development and 163,000 square feet of office-related commercial development (see Section 3.1, Alternatives to the Proposed Project). Current zoning is expected to generate 931 AM peak hour trips and 1,338 [PM] peak hour trips. The project will generate 651 AM peak hour trips and 1,278 PM peak hour trips. Because the proposed project will generate fewer trips during the congested peak hours than existing zoning, the assessment of fees to address project-related impacts along SR 41 may not be appropriate. The City, however, does not object to the developer voluntarily paying the requested Caltrans fee."[5]

---

[5] This discussion confused the no-project alternative—the one meant to reflect buildout under existing zoning—with the Planned Office Development alternative. The square footage and peak-hour traffic figures the EIR cites here are the same as those set forth for the Planned Office Development alternative in the EIR's section on alternatives. It was nowhere claimed in the EIR that the Planned Office Development was compatible with existing zoning, so the claim that the proposed project had no freeway impact because the Planned Office Development's peak-hour impact was greater makes no sense. Absent this confusion—i.e., if the EIR had compared the proposed project with the no-project alternative, representing existing zoning—it is unlikely that the proposed project could be claimed to have less peak-hour freeway traffic. The no-project alternative generated half as many total trips as the proposed project, so a peak-hour spike exceeding that of the proposed project is improbable.

A Caltrans district 6 official named Moses Stites filed a comment letter dated August 27, 2004, in response to the draft EIR. The letter explained that "[v]arious improvements such as auxiliary lanes and additional ramp lanes are currently planned" for the State Route 41 interchange at Friant Road, and that the impact mitigation fees Caltrans was proposing were the project's fair share of the costs of those improvements. The total projected cost of these improvements is not reflected in the record, but a later letter from Caltrans put the cost of one component of them, a southbound auxiliary lane between the Friant and Herndon exits, at $11,640,000.

Stites's August 27 letter disputed the draft EIR's grounds for refusing to require mitigation. It asserted that basic CEQA principles barred the city from simply declining to require mitigation of an acknowledged impact: "Mitigation measures for a project's impacts must be included in an EIR. This determines if a project's impacts can be eliminated or reduced to a level of insignificance. Eliminating or reducing impacts to a level of insignificance is the standard pursuant to CEQA. The lead agency, in this case the City of Fresno, is responsible for administering the CEQA review process and has the principal authority for approving a local development proposal or land use change. Based on this, it is our understanding that it is the **City's** responsibility under CEQA to conduct any necessary nexus study via the environmental process."

The letter also contended that comparing project-generated traffic with traffic that would be generated by a project allowable under existing zoning was not a correct way to measure the project's impact. "Please note that at the time the project site was zoned to its current zoning (1990), mitigation for impacts to the State Highway System was not provided. Therefore, generating fewer trips with this rezone is not relevant. The project is responsible for mitigating . . . its identified impacts."

The letter disputed the EIR's conclusion about the correct fee amount. In a table similar to the one in the draft EIR, it showed that the project's fair share was $445,817. The bulk of the difference was for project-generated trips using the proposed southbound auxiliary lane between the Friant and Herndon exists. The proposed mitigation fee for this improvement was $401,920 (157 trips at $2,560 per trip).

The final EIR, dated September 2004, responded to Caltrans's comments. It continued to insist that the city was relieved of any obligation to require mitigation because it was not satisfied with the information provided by

---

All this means that, in addition to the difficulties discussed in the text above, the claim that the proposed project had a smaller peak-hour impact than existing zoning was unsupported by evidence.

Caltrans. "Other responsible agencies that may be impacted by development such as school and flood control districts" had provided calculations that met with the city's approbation, and "Caltrans should not abdicate the responsibility for calculating development costs and fees to" the city. Further, existing zoning was the correct baseline even though no mitigation was paid when the city adopted existing zoning because "the freeway and associated interchanges were not yet constructed" then. When they were constructed, the state should at its own cost have designed them to accommodate a builtout landscape in accordance with then existing zoning.

Although still refusing to require any mitigation, the final EIR included a revised calculation of what the fee would have been had it been imposed. The adjustment appears to correct a tabulation error in the draft EIR's table. Where the original table showed 24 trips on one ramp at $757 per trip and one trip on another ramp at $1,311 per trip, the revised table showed 24 at $1,311 and one at $757. The result was an increase in the total to $43,897.

The final EIR continued to show a fee of zero for the southbound auxiliary lane between Friant and Herndon. The final EIR admitted that the project would have an impact on that lane, confirming Caltrans's figure of 157 evening peak-hour trips. These trips "will not use 100% of the proposed auxiliary lane," however, so "the project should only be responsible for a portion of the auxiliary lane . . . ." The city would not state a figure for that partial use because "Caltrans needs to identify the per trip costs and methodology applied to derive the per trip fee for the various improvements . . . before fair share costs can be assessed to the project."

Stites responded to these comments in a letter dated October 15, 2004. He agreed that the project should be responsible for only a portion of the 157 project-generated trips on the southbound auxiliary lane from Friant to Herndon. He revised Caltrans's total fair share estimate downward to $306,558. In response to the city's request for cost calculations and methodology, Stites included a detailed explanation of how the figures were derived and attached several worksheets from Caltrans's traffic engineering office. Stites also observed that the portion of State Route 41 including the Friant Road interchange opened in 1989, before the 1990 rezoning; and that it had been designed over a period of years before that, so Caltrans could not possibly have accommodated the rezoning, even assuming it had been under some obligation to do so.

The record contains no response by the city to this last letter. Instead, city staff reported to the planning commission (on Nov. 17, 2004) and the city council (on Dec. 7, 2004) that the city was not obligated to require any form of freeway impact mitigation because Caltrans did not provide the right

information. Ultimately, city staff came to the remarkable conclusion that requiring mitigation of freeway traffic impacts would be *illegal*: "The City has not recommended that the piecemeal application of a state facility traffic impact fee be imposed as a condition of project approval, as it is not evident that Caltrans has accurately documented a project description and cost, a reliable estimate of funding sources, a justifiable nexus or connection between a project and the need for the state facility improvements, and the reasonable proportionality of the project's share of the improvement costs that are necessary to justify the imposition of a traffic impact fee for the improvement of State facilities. This conclusion is based on Caltrans['s] submission of varying descriptions of the necessary freeway improvements, the imprecise estimate of costs and probable funding sources, and the lack of adequate information to comply with Fee Mitigation Act requirements applicable to the City of Fresno. In the absence of this documentation it is not legally permissible for the City to impose the requested traffic impact fee.".

For his part, Zinkin made clear that he believed there was no obligation to mitigate the freeway traffic impacts of his project in any way. In a letter to Caltrans dated October 20, 2004, an attorney representing "the Owners" of the property and writing on stationery of the Law Offices of DeWayne Zinkin stated that "the Owners do not believe that they are required or obligated to pay any fee whatsoever and believe that they are in fact substantially improving the impact upon the interchange . . . ." The letter blamed a variety of factors "unrelated to new development in the area" for local freeway traffic problems. It then proposed to settle all freeway traffic impact mitigation claims for five Zinkin projects in North Fresno for $100,000. Stites forwarded this letter to the city, stating that he did not believe it was possible under CEQA to enter into a settlement regarding impacts of projects for which EIR's had never been prepared and had not been subject to CEQA review. He also stated that neither the Mitigation Fee Act (Gov. Code, § 66000 et seq.) nor the concepts of nexus and proportionality explained in *Nollan v. California Coastal Comm'n, supra*, 483 U.S. 825, and *Dolan v. City of Tigard, supra*, 512 U.S. 374, could serve as excuses for refusing to require any mitigation for an acknowledged significant impact.

The city's stance was pursuant to a long-standing policy of refusing to do this, a policy based not on any analysis of what CEQA requires but on a disagreement between the city and Caltrans over what information Caltrans should supply to the city for use in calculating impact fees. Letters in the record and comments in the final EIR reflect action by the city on this basis going back at least as far at 1998.

Simply stated: The city's practice is illegal. There is no foundation for the idea that the city can refuse to require mitigation of an impact solely because

another agency did not provide information. The seed of the city's confusion, as evidenced in the city staff report to the planning commission and city council, is its belief that the city needs to require mitigation of this category of impacts only if Caltrans proposes a mitigation measure and then proves to the city's satisfaction that the measure is legal. This is not how CEQA works. When the city identifies an impact of a project, CEQA gives it only four choices: (1) to find, based on substantial evidence, that the impact is insignificant; (2) to find, based on substantial evidence, that although the impact is significant, no mitigation is feasible and the project is justified by overriding considerations in spite of this; (3) to require a mitigation measure and find, based on substantial evidence, that the mitigation measure renders the impact insignificant; or (4) to find that mitigation measures are within another agency's responsibility and that the other agency has adopted them or can and should do so. Caltrans's behavior does not create a fifth option.

At the very end of the CEQA process, during the city council meeting at which the project was approved, the city consented to accept the developer's last-minute offer to pay a freeway impact fee voluntarily. During the city council's meeting, Zinkin's attorney stood up and proposed "in a spirit of compromise" that the council impose a freeway traffic impact mitigation fee of $45,000. When Councilmember Duncan made his motion to certify the EIR and approve the project, he proposed a modification to "accept the $45,000 . . . for Caltrans . . . ." The city attorney asked for "clarification," inquiring whether "[t]he $45,000 voluntary mitigation fee, that would be something that would be added to the resolution adopting and certifying the final EIR." No clarification came. The $45,000 offer was mentioned again later and Councilmember Duncan's motion to approve the project was eventually seconded and carried.

The following language appears in the written resolution the council ultimately executed certifying the EIR: "Upon approval of the required 'master' conditional use permit/site plan, the developer shall deposit with the City of Fresno the project's fair share estimate for required improvements to the State Route 41 and related interchange with Friant Road as determined by [the city's traffic consultant] and as depicted on Page 4-6 of the Final EIR dated September 2004 in the amount of $43,897.00." The reason for the slight reduction in amount compared with the offer made by the developer's counsel at the meeting does not appear in the record. The details of the measure—such as the provision that the money be "deposit[ed]" with the City" rather than simply paid to Caltrans—were never subjected to public scrutiny, since they were not mentioned by anyone at the meeting and the EIR was never recirculated after the meeting.

It is also potentially significant that the $43,897 payment is not structured as a condition on site-plan approval and use-permit issuance. As written in

the council's resolution, the measure operates the other way around: Plan approval and permit issuance are conditions that the city must satisfy before Zinkin is required to make payment. Rather than making the city's final approvals depend on payment of the mitigation measure, the resolution makes the obligation to pay the money (even as a mere "deposit") depend on the city's first issuing those approvals. The resolution does not state that the project would suffer any adverse consequence if, after the master conditional use permit is issued and the site plan is approved, the "deposit" should go unpaid. The resolution's statement that the developer "shall deposit" the money cannot be construed as Zinkin's contractually enforceable promise to pay, since the resolution is not a contract and Zinkin is not a signatory of it. The Guidelines state that mitigation measures must be enforceable. (Guidelines, § 15126.4, subd. (a)(2) ["Mitigation measures must be fully enforceable through permit conditions, agreements, or other legally-binding instruments"].) It is not obvious that the resolution imposed on the developer an enforceable obligation to pay any money to Caltrans as a condition on the project going forward.[6]

In spite of this, we will assume for the sake of argument that the language in the resolution regarding a deposit constituted an enforceable obligation. The mitigation of the impact is still not adequate, however, because the $43,897 figure was not supported by substantial evidence. The city describes the difference between the final EIR's figure of $43,897 and Caltrans's final figure of $306,558 as a mere difference of expert opinion; it says the city had discretion to rely on the EIR figure because substantial evidence supported that figure even if it also supported another figure. This is not correct. The *only* difference between the final EIR figure and the final Caltrans figure is that the final Caltrans figure includes a portion of the cost associated with

---

[6] After this court originally issued its opinion in this case, the city and Zinkin requested that we take judicial notice of an agreement between Caltrans and something called "Fresno 40." The request is granted.

So far as the record discloses, no corporate entity named "Fresno 40" exists. No such entity is a party or real party in interest to this litigation. We understand this to be merely an informal name by which the vacant land at issue in this case is commonly known. DeWayne Zinkin signed the agreement on behalf of "Fresno 40."

The agreement recites that "the City of Fresno conditioned this project to mitigate for the identified impacts to the State Highway System at the reduced amount identified in the applicant's Environmental Impact Report, as stated in [the city council's resolution,] and Caltrans has accepted the conditioned reduced amount as full mitigation for this project." The agreement also duplicates the language of the resolution quoted in the text above.

This agreement was executed on May 30, 2006, long after the city council's approval of the project and long after the trial court's ruling in this case. The city is not a party to the agreement. The agreement thus does not constitute a mitigation measure upon which project approval was conditioned. Further, the amount is not supported by substantial evidence for the reasons stated in this opinion. Finally, Caltrans's agreement that the statements in the resolution constitute "full mitigation" does not make it so. Caltrans is not empowered to determine whether another agency has fulfilled its CEQA duties.

project-generated trips that will use the southbound auxiliary lane between Friant and Herndon Avenues while the final EIR figure does not. As we have already said, the final EIR admits that project-generated traffic will have an impact on that lane but sets the mitigation fee for this impact at zero because of dissatisfaction with Caltrans's performance in supplying information. In other words, the EIR admits that its calculation is incomplete—that it leaves out a part of the impact that could be mitigated—and refuses to supply a complete calculation. This means the EIR's figure is not supported by substantial evidence.

Finally, as for the argument that the project actually would have no impact on freeway traffic at all, either because the projected daily trips would fall within the previously approved trip cap or because the project would generate fewer peak-hour trips than a builtout project under preexisting zoning, the baseline discussion earlier in this opinion disposes of this idea. The impact of the project had to be measured against vacant land, which of course generates zero trips.

### 3. *Exhaustion and preservation*

There is no question that administrative remedies have been preserved with respect to this issue. Caltrans's comment letter dealt with the issue exhaustively. In addition, Woodward Park likely preserved this issue by litigating its fifth cause of action, even though it dismissed its first cause of action, which also addressed the issue. We do not rely on this point, however, because Woodward Park's dismissal of the first cause of action might reasonably have been understood as removing all contentions regarding freeway traffic from the trial court's purview. In fact, that is how the trial court understood it.

Due to the exceptions to the preservation doctrine for pure questions of law and issues of public interest, however, we need not decide this question. The issue of the city's illegal policy and its application here were within both exceptions. There is no reason to think a party's affirmative withdrawal (as opposed to its mere neglect) of an issue in the trial court trumps the application of the exceptions.

### B. *Air pollution*

The EIR's air pollution discussion is inadequate for the reason we have already discussed: It proceeds from the wrong environmental baseline, assessing the project's impacts as slight because they are not much greater than the impacts of a builtout development under preexisting zoning and plan designations.

In addition to this, however, Woodward Park argues that the air pollution discussion is inadequate for another reason. It states that "there is no

disclosure and analysis whatsoever of the correlation of 'the identified adverse air quality impacts to resultant adverse health effects.' " Woodward Park relies on *Bakersfield Citizens for Local Control v. City of Bakersfield* (2004) 124 Cal.App.4th 1184 [22 Cal.Rptr.3d 203] (*Bakersfield*), in which we addressed the same issue. In that case, we applied section 15126.2, subdivision (a), of the Guidelines, which requires EIR's to discuss health and safety problems caused by a project's physical impacts on the environment. (*Bakersfield, supra*, at pp. 1219–1220.)

Because the EIR is inadequate as a matter of law for the other reasons discussed in this opinion, we need not address this issue. We express no opinion about whether the EIR's discussion of the health effects of the proposed project's air pollution impacts satisfied CEQA's requirements.

C. *General plan consistency: mix of uses*

Woodward Park's claim that project approval was improper because it resulted in inconsistency in the general plan is based on the following provision of the Government Code: "In construing the provisions of this article, the Legislature intends that the general plan and elements and parts thereof comprise an integrated, internally consistent and compatible statement of policies for the adopting agency." (Gov. Code, § 65300.5.) Members of the public may obtain judicial review of the internal consistency of an agency's general plan; the court applies the deferential standard of review set forth earlier in this opinion. The appropriate remedy for inconsistency is a writ of mandate requiring the agency to take action to render the plan internally consistent. (Gov. Code, § 65301.5; *Murrieta Valley Unified School Dist. v. County of Riverside* (1991) 228 Cal.App.3d 1212, 1235 [279 Cal.Rptr. 421].) Woodward Park contends that the city's decision to approve the project, including the necessary changes to the general plan, rendered that plan inconsistent because the project included a smaller housing component than the general plan required for new developments of its kind in the Woodward Park neighborhood.

We agree with the trial court's conclusion that, at the time the city approved the project, the general plan did not require projects to include any specific quantity of housing. The general plan included an appendix titled "Landscape of Choice—Principles and Strategies," prepared by an organization called Growth Alternatives Alliance. A model ordinance was allegedly attached to the appendix.[7] This model ordinance, according to the trial court,

---

[7] The model ordinance is not included in the administrative record, nor is it part of the copy of the general plan included in the record. In his opening brief, Woodward Park's counsel claims he distributed copies of the ordinance at the city council meeting but admits it is not in the record on appeal. The copy of the general plan posted on the

"provides that 20 to 50 percent of the built square footage of a mixed use project should be residential." Woodward Park claims that the model ordinance is binding law because, when the city council adopted the general plan, it also expressly adopted " 'all text, policies, maps, tables and exhibits' " contained in the plan document. Policy C-8-b of the general plan, however, makes it clear that the model ordinance is only to be used as a source of guidance: "Utilize the model ordinances contained in the 'Liveable Neighborhood Development' implementation guideline of October 2001 (prepared by the Growth Alternatives Alliance for 'A Landscape of Choice') for guidance in preparation of zoning regulations proposing mixing of residential with nonresidential land uses." (2025 Fresno General Plan (Feb. 1, 2002), ch. 4, p. 38.)

Even *without* policy C-8-b, we would not be inclined to treat the model ordinance as binding law. Including something called a model ordinance as an attachment to an appendix to a general plan is very different from enacting an actual ordinance. *With* policy C-8-b, it is apparent that the city did not intend to be bound by any specific ratio of housing to nonhousing uses in mixed-use projects.

This leaves only the general goals and principles for mixed uses set forth in the general plan, such as to "[f]acilitate the development of mixed uses to blend residential, commercial and public land uses on one site," and "[r]edesignate vacant land for higher density uses or mixed use . . . ." (2025 Fresno General Plan, *supra*, p. 38 & appen. A, p. 178.) We cannot say the city abused its discretion in finding that approval of the project was consistent with these general expressions of policy.

Woodward Park's further argument that the city *should* have enacted the model ordinance merits little discussion. The argument is that, because the general plan required the city to begin devising implementation measures within 90 days of the plan's adoption, and the city did not adopt a mixed-use zoning ordinance until much later (after this case was tried), we should retroactively impose an obligation to adhere to the terms of a hypothetical ordinance requiring 20 to 50 percent housing. Even assuming a remedy like this is legally possible under some conceivable circumstances, nothing here authorizes us to impose the terms of the model ordinance and then reverse the city's action on the ground that it violates the terms we have imposed.

---

city's public Web site (of which we take judicial notice) also does not include the model ordinance. (See <http://www.fresno.gov/NR/rdonlyres/CA0CB396-39EB-44C2-8113 93B0AC6A28BA/0/2025GPAppendices.pdf> [as of Apr. 13, 2007].) We rely on the description of the ordinance in the trial court's order and on the trial court's assertion that the ordinance was made part of the appendix.

## *DISPOSITION*

The judgment is reversed. The trial court shall issue a writ of mandate ordering the city to reverse its actions certifying the EIR, approving the rezoning, and approving the plan amendments. Appellants shall recover their costs on appeal.

Cornell, J.,* and Dawson, J., concurred.

A petition for a rehearing was denied May 11, 2007, and the opinion was modified to read as printed above. The petition of real party in interest for review by the Supreme Court was denied July 25, 2007, S152886. Werdegar, J., did not participate therein.

---

*Justice Cornell did not participate in the court's order filed on May 11, 2007, modifying the opinion, denying rehearing, granting a request for judicial notice and denying leave to produce additional evidence. The modification of the opinion did not alter the judgment.